THE PEOPLE OF THE STATE OF NEW YORK ᴇx ʀᴇʟ. DANIEL J. FITZPATRICK *v.* STEPHEN B. FRENCH AND OTHERS, COMMISSIONERS, ETC., OF POLICE, RESPONDENTS.

*Police commissioners of New York city — power of, to try, and remove members of the force for legal offenses —* 1882, *chap.* 410, *sec.* 272.

Under section 272 of chapter 410 of 1882, providing for the trial and removal of members of the police force of New York by the board of police commissioners, the board has power, in the form prescribed by the act, to examine into all offenses, even though they constitute legal offenses committed by policemen, for the purpose of purifying or disciplining the force, without restriction or limitation, based upon the criminal character or other henious-ness of the offense. (Per Davis, P. J., and Daniels, J.; Brady, J. concurring in result.)

*People ex rel. Siebert* v. *The Board of Police Commissioners* (20 Hun, 333) criticised and not followed.

CERTIORARI to review the action of the board of· police commissioners, in removing the relator from the police force.

*John D. Townsend,* for the relator.

*Richard J. Morrisson,* for the respondents.

Davis, P. J.:

The relator was tried upon a charge of " conduct unbecoming an officer." The specification was, in· substance, that the relator on the 14th of April, 1883, " during his tour of patrol duty, pretended that the window of a drinking saloon, No. 16 Dutch street, had been burglariously broken by some person unknown and a short time after entered the said saloon and wrongfully broke open boxes containing cigars, the property of the owner of the saloon, and surreptitiously, without consent of the owner, took and carried away in his pocket one hundred and sixteen cigars, which were subsequently found upon his person when he was searched and identified by William A. Jennings, the proprietor of said drinking saloon, as his property."

It is not asserted that there was any irregularity in form in the proceedings and trial of the relator, but it is insisted : First. That the charge imported a criminal offense of either burglary or larceny,

which the commissioners had no jurisdiction to try; and second. That the evidence was not sufficient to justify a conviction of any offense, or of "conduct unbecoming an officer."

What the evidence on the trial did establish may be briefly stated. The relator was a patrolman of the police force and was on duty on the evening of the 14th of April, 1883. In passing along Dutch street, where the drinking saloon of one Jennings was situated, he discovered that the glass of one of the front windows had been broken under circumstances indicating that the saloon had been entered. He then went a little distance to the corner of the street and gave an alarm which brought to him officers Miller and Daly of the police force, with whom he returned to the saloon. He borrowed Daly's pistol and he and Miller entered the saloon through the window (Daly remained outside), and examined the saloon and the room below, finding all right. The relator then told Miller to go to the station and report the case. Miller went for that purpose and reported to sergeant Oates, who told him to go back and tell officer Daly to go to his post, and the relator "to go to his post and cover it," and to remain himself at the saloon until relieved. Miller returned and directed Daly to go to his post and the relator to go to his, but the latter did not go. Miller entered the saloon and asked the relator if he was going to his post and he answered no. Miller then went down stairs to the water-closet and was absent five or six minutes, and when he came up sergeant Oates had arrived. Sergeant Oates testified that on receiving the report of Miller and giving him his directions, he telegraphed to Jennings at his residence to come to the station-house, and went to the captain's room and reported the case to him, and was directed by him to go down to the saloon and investigate the case. He went there and when he arrived opposite the saloon he saw the relator standing at the bar taking cigars out of cigar boxes and putting them into his pockets. He stepped into the center of the street where he could have a better opportunity to see, and after the relator got through emptying a couple of boxes he broke the boxes up in his hands. He started and came toward the window. Oates stepped over and confronted him and he went back in the room. Oates went into the room and looked around. The relator's pockets were so full of

cigars that he dropped some out on the floor and Oates picked some of them up. He left some cigar boxes and empty wine bottles on the table and Oates told him to pick them up and come with him. Oates left Miller in charge of the place and took the relator to the station-house and made a complaint against him for burglary. The relator was searched and in his pockets were found sixty-six cigars and one full box of cigars.

Jennings, the owner of the saloon, came to the station-house and identified the cigars as his. The relator, on his trial, did not deny taking the cigars, but said, " I took the cigars because I thought I had a right to take the cigars to bring them to the station-house as evidence of the burglary;" and when asked why he broke the boxes, he said, " I tried to press the boxes together so that I would not have so large a bundle to carry."

This is a brief summary of the evidence, but it gives the substance ; and it tended very strongly to show that the relator, in the absence of Miller, intended to and did freely help himself to the cigars in a manner not consistent with his official duty. His excuse, that he intended to take them to the station-house to show that a burglary had been committed, was not satisfactory to the commissioners. He had been directed by Miller to return to his post, but did not go, and said he was not going. Up to that time officer Daly had been with him, but had left, and when Miller went below and left the relator alone, he took advantage of the opportunity to help himself to the cigars, in a manner and under circumstances which can at least be called, in the language of the charge, " surreptitiously." His explanation of his breaking up the boxes after the cigars were taken out and put in his pocket, was certainly a lame one. There was no need to make " a smaller package," unless he designed to keep the cigars and show the pieces of the boxes at the station to give an appearance that the burglars had emptied and broken them. The evidence was abundantly sufficient to show that his conduct, if not criminal, was at least in violation of duty, and " unbecoming an officer." It was not necessary to find him guilty of burglary or of larceny to warrant his removal. There was no evidence to justify a conviction of the former crime, and we are not called upon to say that a jury might not have convicted him of petit larceny. We are not able to see any ground for interfering with

the action of the board of police commissioners for want of sufficient evidence. (*People ex rel. Flanagan* v. *Police Comrs.*, 93 N. Y., 97.)

The relator was, several days after his removal from office, tried on an indictment for larceny and acquitted. Although that fact appears in the printed papers, it has really nothing to do with any question before us. It is no part of the return, and as it subsequently occurred, had no possible effect upon the action of the commissioners. If it were entitled to be considered it would simply establish that the relator's misconduct for which he was removed did not amount to the crime of larceny.

The other question of the case is whether the commissioners had jurisdiction to try the charge set out in the specification. This question arises only upon the assumption that the specification set out a criminal offense, for which the relator might be indicted and tried in a court of justice, and that therefore he could not be tried and removed by the commissioners until he had been convicted on trial by a criminal court. *The People ex rel. Siebert* v. *The Board of Police Commissioners* (20 Hun, 333), is relied upon as establishing that rule. That case was decided by a divided court, Potter, J., holding that under the act conferring their powers upon the commissioners (now sec. 272 of chap. 410 of the Consolidation Act, Laws of 1882), they had no authority to remove a member of the police for any legal offense (which he defined to mean any crime or misdemeanor " enacted by the legislature or existing at the common law") until after a conviction had been had on trial by jury, in a criminal court of competent jurisdiction. Ingalls, J., delivered a dissenting opinion, holding that the intention of the legislature was "to confer upon the board of police commissioners ample authority to investigate summarily all such charges, and if sustained by evidence, to suspend or discharge the offender;" and Brady, J., with much hesitation concurred with Potter, J., saying among other things, " the line is close, I admit, but in such a case I think the doubt should be for the benefit of the relator, leaving the respondents to a further review, if one should be desired."

The case cannot, therefore, be said to be so clearly authoritative as to oblige us to accept and follow it under the rule *stare decisis.* The statute clearly confers the power upon the commissioners to

remove for "legal offenses." The language of the section is: "The board of police shall have power in its discretion, on conviction of a member of the force of any legal offense, or neglect of duty, or violation of rules, or neglect or disobedience of orders, or absence without leave, or any conduct injurious to the public peace or welfare, or immoral conduct, or conduct unbecoming an officer, or other breach of discipline, to punish the offending party by reprimand, forfeiting and withholding pay for a specified time, or dismissal from the force;" * * * "after written charges shall have been preferred against him, and after the charges have been publicly examined into, upon such reasonable notice to the person charged, and in such manner of examination as the rules and regulations of the board of police may prescribe." There can be no doubt that the legislature intended that the mode of trial or examination provided by the section should be applicable to all the grounds for removal, after conviction, recited in the section, and that the proceedings should be summary and efficient to enable the board to maintain the *morale,* the dignity and vigor of the force.

It has often been held by this court, and lately by the Court of Appeals (*People ex rel. Flanagan* v. *The Board of Police,* 93 N. Y., 97), that the commissioners, when acting under this section, are not a court within the provisions of the Constitution of the State; and MILLER, J., in the course of the opinion of the court, says: "As the board of commissioners do not constitute a court its proceedings are not to be controlled or decided by the same degree of formality that would be required upon a charge of a criminal offense before ordinary tribunals of justice."

A trial before the board is a mere investigation to maintain the discipline of the police force which they are empowered to accomplish by the removal of those they adjudge unfit for the position, or by some lighter penalty ranging from mere reprimand up to suspension or forfeiture of pay.

The rule that all "legal offenses," which, as Mr. Justice POTTER correctly shows, are all grades of criminal offenses triable by courts (Code of Criminal Pro., § 63), cannot be investigated or acted upon till after a conviction has been had in a court of justice, necessarily springs out of the provisions of the Constitution, if it has any existence at all. That he so regarded it may be seen by his

opinion. He says : " By legal offenses are meant crimes and mis- demeanors enacted by the legislature or existing at the common law. When a policeman has been convicted of any of these offenses, by the tribunal and in the manner prescribed by law, the respondent (the board) may remove for such conviction. The idea that the board of police may try and convict persons charged with perjury, murder, arson or other legal offenses, is simply preposterous. Those offenses can only be tried by a jury and in the mode provided by law. Neither an act of the legislature or the consent of the accused will justify a trial for these offenses in any different manner."

This argument, it is manifest, altogether rests upon the idea that the inquiry of the board of police contravenes the provisions of the Constitution which secure to persons accused of crime, the estab- lished modes of trial, upon indictment and before a court and jury in the higher classes of crime, and the procedure in and by courts with or without jury in the lower grades. But it ignores the fact that the investigation of the police board is not such a trial and entails no such consequences upon an accused party. It is pre- cisely analogous to the investigation by any other corporate body of the fitness of its servants to remain in charge of the duties they are appointed to perform, or of members of the corporate body to continue in that relation. The city of New York is a public cor- poration. The police department is one of the agencies through which its functions are to be performed ; and no court has ever held that the heads of that department cannot be removed upon adequate grounds in the manner the legislature may see fit to prescribe. But the argument is that if he be a murderer, or felon, or criminal of any grade, the legislature cannot authorize his removal by any authority until he has first been indicted, tried and convicted and sentenced by a constitutional court of justice in the forms preserved by the Constitution. It is not well to confuse the powers of admin- istrative or executive bodies to remove subordinates for any conduct showing unfitness for place or position, with the pro- ceedings of courts of justice to punish crimes. They are essen- tially different in their objects, and may and do exert and move in their respective spheres without collision or inconsistency. If it be true that a policeman guilty of felony cannot be removed by the board till after his conviction and sentence in a

court of justice, because of constitutional prevention, then some astute lawyer will speedily insist that a felon cannot be removed at all for crime, because the same constitutional safeguards provide that he shall not be *twice tried* or punished for the same offense. The answer will be that a conviction of felony forfeits all public office, but not so of misdemeanors, and where the convict has paid the penalty imposed by the court, why should he not interpose the plea of *autrefois convict*, when the police board arraign him for trial and another punishment? It has been seen that legal offenses are all grades of crime. Let us consider for a moment the effect of the construction given to the section authorizing trial by the board of police, which requires conviction by a court of justice before removal or any other punishment. A policeman when arraigned before the board in such a case may always answer to the offense, " I am charged with a crime, you must arrest your proceedings till I am convicted in court;" and then if the board venture to proceed, a writ of prohibition must issue from the court for want of jurisdiction in the board. The policeman may never be indicted or even arrested for the offense, or never brought to trial in court; but that makes no difference with the question of jurisdiction of the board, since conviction in court is a condition precedent; and so the police force may grow in time into a body of accomplished criminals, whom the commissioners cannot remove nor suspend; nor withhold their pay, nor even reprimand, because the dilatory or over-crowded courts do not bring them to trial and conviction. And again, if a policeman guilty of any crime, however monstrous, can slip through the meshes of the law on some technicality, he can laugh at both courts and commissioners and hold his office by the absolute title of an unconvicted policeman. When we consider the vast scope of the phrase " legal offenses," we shall be able to estimate the possible, if not probable, consequences of such a rule as is laid down in Siebert's case. Every misdemeanor as well as every felony triable by any court, is within its significance; and as every willful neglect of duty by a public officer is a misdemeanor, the power of the board to remove before conviction is reduced substantially to cases of accident, where there should perhaps be no removal at all. The offender could defeat jurisdiction in all cases by showing that his offense was willful, or that he violated the rules intentionally, or

that he purposely was guilty of the "conduct injurious to public morals."

Every policeman charged with crime, who could get out on bail, no matter what his offense, nor how clearly provable, could still walk the street clad in a policeman's uniform, with authority to club his fellow citizens till his trial should come off; or, if unable to get bail, his absence from duty while in jail awaiting trial, being enforced by law, would be excusable absence and not prejudicial to his right to hold the office or draw his salary.

The argument *reductio ad absurdum* is in this case valuable because it shows so forcibly the dangers to which the contrary view exposes the public peace and safety in their most vulnerable point. Nothing can be more important than a competent and faithful police force in our city, and nothing therefore is more necessary than that the heads of the department should be clothed with the most ample and summary authority, upon conviction, to remove the members of the force who are guilty of any legal offense, or of acts dangerous to the morals or peace of the public. The courts seem in all cases but the Siebert case to so regard their powers.

In *The People ex rel. Murphy* v. *French* (60 How. Pr. Rep., 377), Van Vorst, J., held that a policeman was properly tried and dismissed for accepting bribes from the keeper of a house of prostitution—a crime both by statute and at common law — and was lawfully removed; and the General Term affirmed the decision.

In *The People ex rel. Connolly* v. *Police Commissioners* (11 Hun, 403), the board dismissed an officer who, when off duty, enticed a girl into a house of assignation, and the General Term affirmed the decision.

In *The People ex rel. Shea* v. *Police Commissioners* (9 Hun, 222) the officer was removed for being guilty of assault and battery, and the court sustained the action of the board.

In *People ex rel. Foley* v. *Police Commissioners* (8 Weekly Dig., 466) the officer was removed for failing to serve an order of arrest. The board was sustained by the court.

In *People ex rel. Donovan* v. *Police Commissioners* (77 N. Y., 153) the fire commissioners were sustained in the Court of Appeals, as to removal for fighting.

In *People ex rel. Riley* v. *Police Commissioners* (15 Weekly

Dig., 278) the removal was for oppression. There are numerous other cases where the charge is one which, if willfully done, would be indictable, in which the courts have affirmed the decisions of the commissioners. We have therefore no hesitation in saying that, both in reason and in law, the board of police have power, in the form prescribed by statute, to examine into all offenses committed by policemen, for the purpose of purifying or disciplining the force, without restriction or limitation based upon the criminal character or other heinousness of the crime.

We think the proceedings of the board in this case should be affirmed, and the writ dismissed, with costs.

DANIELS, J., concurred.

BRADY, J. :

The relator's case is clearly distinguishable from that of Siebert to which the presiding justice gives so much consideration. The specification against Siebert was that while testifying as a witness in a trial before the commissioners of a brother policeman he had sworn falsely, and it was alleged that his testimony was important and material to the issue as to which he was testifying. The charge against the relator herein was one which involved a clear breach of discipline while in the discharge of his duty. He should have protected the property found upon the premises burglariously entered, and restore to the owner any which but for such restoration might have been lost. This he says he undertook to do, by taking the cigars which were found upon his person; but his story was not believed and it cannot be said that the conclusion in that respect was not entirely correct, although it seems strange he should have gone to the station-house with the property in his possession which he took from the premises.

Siebert was not charged with a violation or omission of any duty to be performed as a policeman, but of conduct unbecoming an officer, namely, having sworn falsely. Whether that adjudication shall govern in a similar case need not be discussed. It is enough to say of it that it is not controlling here in any sense.

The necessity of enforcing discipline and of punishing delinquents on the police force no one can gainsay. It has been recognized and declared frequently by this court in the broadest terms,

although it·was not necessary·to announce a proposition so manifest·. The case of Siebert was not designed to invade this doctrine in any respect. It held simply that the police commissioners had not the· power to try one of the force, on the specification only of having sworn falsely in a case where his evidence, as a witness, was important and material to the issue under investigation. I concur in the result arirved at, therefore, by my brethern in this matter.

Writ dismissed, with costs.